# FANNIE BRENGLE FRUSH et al. *vs.* CHARLES F. GREEN, GEORGE A. HORNER, Trustee, et al.

*Undue Influence—Capacity to Make a Deed—Evidence of Physician— Deed of Trust Executed Upon Grantor's Deathbed—General Interrogatory in Equity Cases.*

When a man upon his deathbed, in great bodily pain, executes a deed of trust conveying all his property and making a disposition of the same which frequently reverses his frequently declared purpose and is in direct conflict with all his antecedent conduct, and there is no evidence of any rational motive to account for the change, the presumption is that such deed is the act of one mentally disordered or under the dominion of undue influence.

Undue influence is not every mere entreaty or pressing solicitation that may be used to sway the conduct or to persuade the judgment of another; but it is that degree of importunity which deprives one of his free agency—such as he is too weak to resist and such as will render the instrument executed under its supremacy not his free act.

When a reason is assigned for the execution of a deed of trust by which the grantor in his last illness makes a disposition of his property which is unjust in itself and in opposition with his frequently declared purposes and his previous conduct, then the truth or existence of that reason is open to examination when the deed is impeached because obtained by undue influence.

The testimony of a man's attending physician as to his mental capacity outweighs that of strangers who saw the man for a few minutes only the day before he died.

An aged man during his last illness, while suffering from a wasting and enfeebling disease, executed, four days before his death, a deed of trust conveying all his property. By this deed the estate was given to relatives of his with whom he had but slight intercourse during his life and for whom he had frequently expressed an aversion. Other relations, who were unprovided for by the deed, were persons with whom he had lived for many years upon affectionate terms, who had been supported by him, who had nursed him during long illnesses and for whom, during many years before his death, he had declared to third parties that it was his intention to provide. The reasons he was alleged to have given for this change of purpose were utterly frivolous. For some days before his death the grantor was surrounded and importuned by the beneficiaries under the deed. His attending physician, who saw him half an hour after the deed was signed, testified that he was then utterly incapable of making a valid

deed or contract. *Held*, upon the facts, that the deed was obtained by the exercise of undue influence and was executed at a time when the grantor was not mentally capable of making a valid deed, and that the same should be vacated.

A rule for taking testimony in equity causes provides that at the conclusion of the examination of a witness, the examiner shall ask if he knows of any other matter of benefit to the parties or material to the subject of the examination. In this case the plaintiffs called one of the defendants, who was not a competent witness upon his own offer or upon the call of his co-defendants, to produce a certain paper. He was then dismissed without any question relating to the merits of the case having been asked him. When the above-mentioned general interrogatory was asked him he went into a long and detailed account of the merits of the case. *Held*, that such answer should be suppressed.

Appeal from a decree of Circuit Court No. 2, of Baltimore City (STOCKBRIDGE, J.), dismissing the bill of complaint.

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE, PAGE, ROBERTS and BOYD, JJ.

*Fielder C. Slingluff* and *Thomas R. Clendinen*, for the appellants.

*Robert H. Smith* and *Frank Gosnell* (with whom were *T. M. Lanahan* and *James W. Denny* on the brief), for the appellees.

McSHERRY, C. J., delivered the opinion of the Court.

This proceeding originated in Circuit Court No. Two, of Baltimore City, by a bill in equity filed on July eighteenth, eighteen hundred and ninety-five. The bill was filed by Miss Fannie Brengel Frush against sundry defendants. It recites in substance that the plaintiff was the niece of one Luther M. Frush, who had died five days prior to the filing of the bill. That on July the eighth, or five days anterior to his death, which occurred on the thirteenth, he purported to execute a deed of trust conveying to one George A. Horner all the property, real, personal and mixed, of which the grantor was then possessed. That by the deed of trust,

after making provision for the payment of his debts and reserving a life-estate to himself, the grantor gave all of the ground rents owned by him to his sister, Mrs. Leas; two thousand dollars to his sister-in-law, Mrs. Sarah E. Frush; three thousand dollars to Miss May Callender Dotterveich; a piano to the plaintiff, and the entire rest and residue of his estate to four of the eight children of another sister, Mrs. Green—one of these four being the wife of the trustee, Horner. The bill proceeds to describe the cordial relations that existed between the plaintiff and her uncle, and to allege that until within a month prior to his death Luther M. Frush had been on bad terms with, and quite hostile to, his sister, Mrs. Green, and many of the members of her family. The bill charges that the deed was procured by the exercise of undue influence, and that at the time the deed purports to have been executed, the grantor was not of sound mind and memory, capable of making a valid deed or contract. It prayed that a decree might be passed vacating and annulling the instrument. Six days later four children of William W. Frush, a deceased brother of Luther Frush, filed a petition in the case asking to be made co-plaintiffs, and leave was granted accordingly. Subsequently, for satisfactory reasons, one of these four new plaintiffs caused the bill to be dismissed as to himself. Later on all the defendants answered, Mrs. Sarah E. Frush admitting the averments of the bill, the others denying them, and a great mass of testimony was taken. The Court below dismissed the bill on final hearing and from that decree the plaintiffs have brought the cause up to this Court on appeal.

The record is voluminous—it contains eight hundred and seventy closely printed solid pages, which have been patiently perused. It recounts with minute and graphic detail a family wrangle over a dead man's estate; and it abounds with indications of the bitterness which such a contest usually engenders. To attempt to reconcile the flatly conflicting statements of many of the witnesses would be a hopeless task indeed; and it would swell this opinion far beyond

any reasonable limit, if we ventured into an analysis of the vast mass of evidence before us. A general outline of the leading and controlling events in the drama with which we have to deal and a summary of the conclusions which we have finally drawn from a careful view of the whole field will solve the questions that confront us.

William Frush, the father of Luther M. Frush, lived for many years on Madison avenue in Baltimore City. At the time of his death his family consisted of himself, his son Luther, who was a bachelor, his daughter Mrs. Leas, who was a widow, his daughter-in-law Mrs. Sarah E. Frush, the widow of a deceased son, and his granddaughter, Miss Fannie Brengel Frush, who was the daughter of Mrs. Sarah E. Frush. Mrs. Sarah E. Frush was the daughter of Dr. Leas. After the death of her mother her father married again, his second wife being the Mrs. Leas just mentioned—the daughter of William Frush. Thus Mrs. Sarah Frush became by marrying Mrs. Leas' brother, Mrs. Leas' sister-in-law, whilst prior to that Mrs. Leas by marrying Mrs. Sarah Frush's father had become Mrs. Frush's stepmother. When Dr. Leas married the second time, Mrs. Sarah Frush was a child ten years of age living at her father's home. After she became a widow, Mrs. Frush with her infant daughter—now Miss Fannie Frush—left her father's house and went to reside with her deceased husband's father, William Frush. There Mrs. Frush and Miss Fannie made their home until the death of William Frush in eighteen hundred and ninety-two. When Dr. Leas died, his widow—the daughter of William Frush—returned to her father's home. Upon the death of the wife of William Frush, about eighteen hundred and seventy-nine, Mrs. Sarah Frush became the house-keeper. Upon the death of William Frush, Luther Frush assumed his father's place as the head of the household, and Mrs. Sarah Frush continued in the position of housekeeper for her brother-in-law. It was in this domestic circle that Miss Fannie grew from childhood to womanhood and the great preponderance of the evidence leads us to believe that

she was a source of pride to her Uncle Luther, and the person of all others upon whom was centered such affection as his rather selfish and undemonstrative nature was susceptible. It is certain that he spoke of her at various times and to numbers of persons in the most kindly terms, and apart from the utterly trivial and inconsequential differences of opinion between them on rare occasions there is, if we lay out of view for the moment the testimony of the individuals who are interested in sustaining this deed, no suggestion from any reliable source that the current of his feelings towards her ever changed till the day the deed of trust was made. In addition to his affection for her, which impressed more than one observer as rather that of a father for his child than that of an uncle for his niece, he repeatedly declared to disinterested witnesses—witnesses who can have no possible motive for misrepresenting or perverting the truth—that he intended to provide liberally for her. And these declarations were made when there was no question of his mental capacity to transact his business with intelligence and understanding. That he was warmly attached to Miss Fannie's mother is equally clear from the evidence. She was, as Dr. Bevan says, a woman of as big a heart as he ever saw about a sick man. She had been faithful in her management of his household and when a distressing and progressive disease smote him with a heavy hand she was unremitting in her watchfulness and attention. There was every reason for the existence of the affection towards Miss Fannie which the witnesses describe—it is consistent with his declarations and his conduct up to the making of the deed. If it be not true that this kindly relation existed between the uncle and niece and if he really regarded her as a "terrible woman"—as some of the appellees pretend that he said she was—there is but one mode of reconciling these inconsistent declarations, and that is by imputing to Luther Frush a low, repulsive duplicity that does not harmonize with his character as portrayed by the evidence. It is of vital consequence to the contesting beneficiaries under the

deed that it be shown there were no cordial relations be-
tween Miss Fannie and her uncle, and they accordingly fur-
nish the evidence themselves.    At the very outset we meet
a conflict between wholly disinterested witnesses who have
nothing at stake in the pending cause, and these benefici-
aries under the deed—Mrs. Leas, a sister, who gets all the
ground rents ; Mrs. Green, a sister, whose four children
get nearly or quite one-half and perhaps more than one-
half of the estate—Mrs. Horner, one of Mrs. Green's chil-
dren who gets one-fourth of that half—Mr. Horner, her
husband, who is also the trustee—and Miss Dotterveich, a
stranger, who gets three thousand dollars.    With motives
such as these conditions inspire, to warp and bias their
memories and to inflame their feelings, we are not prepared
to accept their conclusions as to the alleged antipathy of
Mr. Frush towards Miss Fannie, in preference to the con-
trary testimony of many witnesses who have no interest,
pecuniary or other sort, in the controversy.

It is a fact about which there is no dispute that for years
prior to June, eighteen hundred and ninety-five, Mrs. Green
—the mother of four of the beneficiaries who get about half
of the entire estate—was not on speaking terms, or at least,
not on terms of intimacy, with her brother Luther ; and that
the latter took but little interest in her children.    He had a
dislike for Horner, and repeatedly spoke of him in dispar-
aging terms.    He had expressed an intention to have the
Safe Deposit and Trust Company settle up his affairs.

Without pausing at this juncture to trace the progress of
his disease or to dwell on its obvious effect on his mental
faculties ; and passing over, for the time being, the events
that transpired between the time that his malady became
more virulent and the date of his death ; we come to the
day the deed of trust was executed.    That deed was a
deathbed transaction and the dread of impending dissolution
was evidently then upon him.    It bears date July the eighth,
eighteen hundred and ninety-five, and was signed and ac-
knowledged late in the afternoon or early in the evening.

On the morning of the thirteenth he died. The deed reversed, by its dispositions, the declared purposes of the past. It cut off the only person he had ever announced to disinterested individuals his intention to make provision for; it conveyed in trust his whole estate for his own life to an individual in whom he had no confidence, instead of to the Trust Company as he had in health expressed his determination to do, and it named as the chief beneficiaries the persons towards whom, though his kindred, he was in fact a comparative stranger. Why this sudden, singular change? A complete and total revolution of intention—if intention existed at all in the act done? Rational and perfectly free beings do not, and under the very law of their existence cannot, do a voluntary act without some motive. It is just as impossible to conceive the notion of intelligent and voluntary action by such an agent without a motive of some sort, as it is to evolve the idea of physical motion without an efficient cause. It is a general law, founded on experience and observation, that there is a uniformity in human action, and a consequent possibility of foreseeing it, sufficient to be the basis of confidence and the determination of action between man and man; from which it may be fairly implied that men will act in the near future precisely as they have been acting in the past. Naturally, then, and conformably to this law, when Luther Frush came to make a disposition of his property, looking at his past conduct, including his past declarations, the results ought to have been in accord with and not diametrically hostile to the avowed purpose of his life. If there was no motive, or an utterly inadequate motive, tantamount to none at all, prompting him to reverse the declared and apparently settled purpose of his life—causing him to do precisely the opposite of that which would ordinarily have been expected of him from his antecedent conduct—then the unexpected, unlooked for act that was done must have proceeded either from a mind acting without a motive at all, or from the mind and dominion of some one else. In the first instance the act would be the emanation

of one incapable of intelligent action and would be, there-
fore, invalid ; in the second, it would be the product of some
other intelligence overmastering the ostensible actor, and
would be, therefore, the outgrowth of an influence which
the law denounces as undue.   We distinguish a condition
where there is no motive or a totally inadequate motive tan-
tamount to none at all, from a condition where simply no
motive appears.   In the one case the act done is invalid in
one or the other of t'.e two ways just indicated ; in the other
a suspicion of its integrity is at least suggested.   The bare
fact that the deed of trust reverses, and suddenly reverses,
the whole course of the grantor's expressed intentions, sug-
gests, at the outset, in the absence of an apparent rational
or sufficient motive to induce or to account for the change,
that the deed must have sprung either from one mentally
disordered or from one under the dominion of an undue in-
fluence.   No other hypothesis will explain its provisions
unless some intelligent motive, not apparent, be discov-
ered.   To these two hypotheses in the inverse order in which
they have just been named we now direct our attention.

Undue influence is not, of course, every mere entreaty or
pressing solicitation that may be invoked to sway the con-
duct or to persuade the judgment of another ; but it is that
degree of importunity which deprives one of his free agency—
such as he is too weak or too feeble to resist, and such as
will render the instrument executed under its supremacy
not his free and unconstrained act.   It often closely resem-
bles and is near akin to actual fraud, and like the latter when
most cunningly employed is exceedingly difficult to expose.
From the very nature and secrecy of the wrong itself, it is
rare that direct evidence can be procured to unmask it, and
hence the results accomplished in a given case, the diverg-
ence of those results from the course which would ordinarily
and naturally be looked for, the situation of the parties tak-
ing benefits under an instrument, alleged to be the product
of its dominion towards the person who has executed that
instrument, their antecedent relations to and intercourse

with each other; the legitimate, but unrecognized claims of others upon the bounty of the one who has discarded them; their dependence upon him; his prior declarations; the instincts of justice and the promptings of gratitude of which every unbiased mind is sensible; the natural ties of affection, together with all the circumstances surrounding the entire transaction under investigation, and the inferences legitimately deducible from them, often furnish, even in the teeth of directly contradictory testimony, ample ground for the conclusion that undue influence has been successfully resorted to, to accomplish an end which is grossly unjust and whose very existence cannot be satisfactorily accounted for or explained except upon the theory that undue influence has produced it.

Luther M. Frush was a man about sixty-eight years of age when the deed that is now being assailed was executed. For several months prior to his death he had been suffering greatly from a disease of the prostate gland that finally developed into cancer. In January preceding his death he was taken severely ill at his home on Madison avenue. He was weakened and his nervous system became involved. He required constant attention day and night. The attention was exacting and included services of the most menial character. During the day his sister, Mrs. Leas, and his niece, Miss Fannie, took care of him, and during the night his sister-in-law remained in his room and looked after him. We need not go into the details of this incessant watchfulness and care. His sister, Mrs. Green—whose four children are the chief beneficiaries—gave him no attention whatever, nor did any of her children. After he had rallied somewhat from this acute attack, he again went about. He took a trip to Atlantic City, but went in company with his sister-in-law, who carried with her a quantity of bed-linen which she used upon his bed to protect that of the hotel, and which she washed in her own room and with her own hands daily and then dried before a gas jet. The constant escape of urine required her to wash his under and his outer

garments and to dry them in the same way ; and besides this she kept clean and disinfected the catheter which it was necessary for him to use.

Upon his return from Atlantic City he had not improved and his physician, Dr. Bevan, advised him to ride out frequently in the country. When it became difficult for him to do this in his conveyance he used the street cars. Despite all this and despite the medical attention his disease grew steadily worse. It was a progressive disease. As it advanced it lowered his vitality, increased his irritability and correspondingly affected his mental forces. During all this time there is not the slightest indication of a change in his feelings towards his niece ; nor is there any suggestion that his antipathy towards the Greens and the Horners had in the least been modified. About this period there appears the first trace or foot-print of the scheme that ultimately culminated in the deed of trust. When one of his nephews— one of the sons of his deceased brother William—called at his house to see him, Mrs. Leas informed the visitor, her own nephew, that his Uncle Luther was too indisposed to receive him—that he needed absolute quiet and rest. Assuming this to be true he remained in the dining-room a few moments until Mrs. Horner—one of Mrs. Green's daughters and the wife of the trustee—entered ; and upon her being told the same thing as to her uncle's condition that Mrs. Leas had just stated to the nephew, Mrs. Horner exclaimed that she would not think of disturbing her uncle. Thereupon young Frush departed from the dining-room, his aunt, Mrs. Leas, saying to him that as he knew the way to the front door she would not accompany him. On his way through the hall he met Miss Fannie, to whom he narrated what Mrs. Leas had said, but he was informed by Miss Fannie that he could see his uncle, who was sitting up ; and she immediately took him to the uncle's room. He had scarcely taken his seat when Mrs. Leas and Mrs. Horner, who both supposed he had left the house, entered the room together and upon seeing him were considerably embar-

rassed. . Not long after this event Luther Frush is found at the residence of Mrs. Horner in Walbrook ; and this is the first time he ever had been under her roof. He spent a week there. He at once sent to the city for Mrs. Sarah Frush, and she went out every night and cared for him precisely as she had regularly done at his home on Madison avenue. This she did each night that he remained at Mrs. Horner's, returning every morning to the city. The first whisper (aside from the testimony of Miss Dotterveich) that we hear of any expressions by Luther Frush of unfriendly feelings towards Miss Fannie and her mother, comes from the inmates of the Horner household. These expressions are alleged to have been spoken by Luther Frush during the week he spent at Horner's ; and that was the week beginning with May the thirty-first—less than a month and a half before he died. But it is utterly incomprehensible how Luther Frush could have spoken of Mrs. Frush and her daughter in the disparaging terms these interested witnesses say that he used whilst he was depending on Mrs. Sarah Frush to care for him in the Horner house during each night, and to transact much of his business in the city during the day. The sentiments attributed to him—alleged to have been uttered by him—at the very time he was acting towards this sister-in-law and niece in a way that flatly contradicted the imputed sentiments, is a very strong circumstance to show, either, that he gave utterance to no such statements at all, or, if he did, that they were the coinage of others' brains impressed upon his enfeebled and his failing mind. Upon the expiration of the week he spent at Horner's he took possession of a furnished cottage which he leased on the Pimlico road. This was early in June. Mrs. Leas, Mrs. Sarah Frush and Miss Fannie accompanied him. The Greens and the Horners soon began to visit him with great regularity. It was apparent that he was nearing the end of his life. Their attentions were in marked contrast with their former neglect.ʼ With the steady progression of his disease and the corresponding decay of his physical and

mental powers, the assiduous watchfulness of the very persons who a few weeks previously had been shunned and disliked by him, significantly increased; though even then no one of them rendered the menial service which Mrs. Frush and Miss Fannie continued faithfully to perform. George A. Horner grew particularly demonstrative and his visits became more frequent.   He was informed through Mrs. Leas that Frush wanted him to fix up his, Frush's, affairs, and he was urged to go frequently to the Pimlico cottage.   When he visited the sick man he would sit with his arm around him, though the odor from the disease was scarcely endurable.   Horner, whom Frush distrusted, whose house Frush had never entered till the last of May, would get upon the bed where the invalid was lying and would fondle him there, and rub his head and pat him, though the cancerous affection had attacked his nose and though the bed-clothing was saturated with offensive exudations. His sister, Mrs. Green, whom he had denounced as a "blatherskite," constantly hovered about him; and finally on July the sixth, after he had so far deteriorated as to be no longer able to leave his bed, Horner was closeted with him, Miss Fannie having first been requested by Horner to retire from the room.   When that interview closed Horner went away with a memorandum for a deed of trust.   Mrs. Leas supposed a will was to be drawn and she told Heiderman that a will was to be executed that evening.   The memorandum was prepared by Horner and was taken by him to Mr. Donaldson, who was Mr. Frush's legal adviser. A discussion at once arose between Mr. Donaldson and Mr. Horner as to the fee for preparing the deed.   Mr. Donaldson said to Mr. Horner: "I have been Mr. Frush's attorney now for several years, and I do not know that he has ever had any discussion or any question about a fee with me, and you can just say to Mr. Frush that whatever is the proper fee, that I can arrange with him when I see him." To this Mr. Horner replied: "No, Mr. Frush is not attending to this business.   I am attending to it; now, I am mak-

ing these arrangements, I am the trustee; and I want to know what you are going to charge." Subsequently the same day Mr. Donaldson went to see Mr. Frush, and though he had grave misgivings as to whether he ought to prepare the deed, finally he did prepare it—and on the evening of July the eighth, in company with Horner and a magistrate, he went to the cottage on the Pimlico road and Mr. Frush's signature was appended to the paper and his acknowledgment was certified by the Justice of the Peace. Just as Mr. Donaldson left Dr. Bevan arrived. The doctor found considerable excitement in the household and he saw that his patient was decidedly worse. Frush was nervous and prostrated and needed an anodyne which was then administered. Dr. Bevan is emphatic in the statement that when he reached his patient's bedside that evening Frush was not mentally capable of transacting business; and this was certainly within thirty minutes after the deed had been signed. We allude to this testimony of the physician at this point not for the purpose of discussing now the first of the two hypotheses before alluded to, but merely as reflecting upon the question of undue influence. A man in the mental condition in which the doctor found Frush that evening must have been shortly anterior thereto an easy subject for the persistent and unduly importunate to influence and control; if he were not, in fact, so far deprived of his mental faculties as to be wholly incapable of making a valid deed or contract at all.

We have stated the substance of the contents of the deed, and we have said that every provision of it, except the gift to Mrs. Leas and the small gift to Mrs. Frush, was directly the opposite of what he had long before declared he intended to make. Not only is this so, as we have already suggested, but the very persons he disliked the most were made the chief beneficiaries and the one person for whom he entertained the warmest regard was practically ignored. The results accomplished by the deed are widely divergent from the course which would ordinarily and naturally have been looked for. The instincts of a just man and the promptings

of a grateful one towards those who had so faithfully taken care of him were stifled or suppressed, though had his mind been uninfluenced he would in obedience to the most natural of impulses, have been fully sensible of them. The obviously designing demeanor of Horner and his selection as trustee though the grantor had in health expressed a lack of confidence in his business capacity ; and the evident effort of some of the beneficiaries to cultivate in his last sickness an aged relative who, when in health, they either never recognized or else studiously neglected, and who, had he been pecuniarily destitute, they most probably never would have noticed and certainly never would have courted ; are all circumstances that proclaim the presence and denote the sway of an influence sufficient to warp and eventually to overthrow a settled purpose, though the act done to change that purpose be surrounded by the outward semblances of deliberation. So strikingly are such circumstances at variance with the ordinary conduct of men and so conclusively are they indicative of the intervention of an agency superior to a grantor's volition, especially when he is on the verge of the grave, that generally they call for the assignment of a motive sufficiently cogent to justify the doing of the act complained of, or the act itself, standing without explanation, is tainted with the gravest suspicion, if nothing worse. It is not surprising, then, to find the contesting beneficiaries attributing to Luther Frush some motive for making the dispositions which the deed contains. But the alleged motives—such as they are—have been proved only by interested witnessess and were brought to light under conditions that confirm the conclusion that no motives of his, or having an origin in his own mind, ever influenced Frush at all.

Generally speaking a man may dispose as he pleases of that which is his own and he is under no obligation to assign a reason for his conduct. When it is assumed or conceded that he has made a disposition that he intended to make it must also be assumed or conceded that there were volition and intelligence in the act that was done. And

when there is volition and when there is intelligence it is wholly immaterial as to what motive prompted or induced the act. When, however, a reason *is* assigned for the doing of an act, which act standing alone is so flagrantly unjust as of itself to suggest a suspicion that it was either not voluntary or else that it was not the emanation of a capable mind, then the *truth* or the *existence* of *that* reason is essentially open to examination upon an inquiry as to the freedom or intelligence with which the act, asserted to have proceeded from that reason, was done; and the solution of the inquiry may largely depend upon the ultimate result reached upon the examination of the truth or the existence of the reason or the motive assigned for the performance of the act itself. We are now brought to a consideration of the reasons advanced for the disinheriting of Miss Fannie.

. Within a day or two after the deed had been executed it was suggested by Mr. Robert Green, the father-in-law of Mr. Horner, the trustee, that it would be advisable to have witnessess go out and ascertain the intentions of Mr. Frush as expressed in the deed, so as to be able to testify thereto in the event that the deed were assailed. Mr. Horner then conferred with his counsel, who advised him to the same effect. Accordingly Mr. Horner took three witnessess to the Pimlico cottage on Thursday, July the eleventh, but the physician peremptorily prohibited them from entering the sick room. On Friday morning, the twelfth, they returned, and after Mr. Horner had first gone in the room and remained for ten minutes with the sick man, the witnesses were ushered in. Mrs. Leas was there before the witnesses entered, and whilst she was there this is what took place : " Mr. Horner said to my brother, 'Uncle Luther, I think Aunt Lizzie (that is Mrs. Leas), and I have got ourselves in trouble ;' he said , ' They accuse us of making your deed ; would you mind if I bring some of my friends in, of telling them that we did not, telling them you made it yourself; he said, none, not in the least ;' so Mr. Horner then went out and brought these gentlemen in. " Mr. Frush was

propped in bed with pillows.    The trained nurses were not present.    What took place will be stated in the language of one of the three witnesses.    Mr. Manahan thus describes the unusual scene : " Well, I went in with Mr. George Horner ; he said, ' Uncle Luther, this is Mr. Manahan, you met him at my house ;' he said, ' yes, I remember meeting some one out there, but I don't exactly remember him ; and then Mr. Frush said, ' I have inquired as to Mr. Horner's honesty and veracity and I am satisfied.'    Mrs. Leas asked him if she had influenced him, and he said no.    George Horner asked him if he, or any one else had influenced him, and he said no, and he added, looking at George Horner, that, ' *If I had listened to you I would have done more for Fannie,*' and then Mr. George Horner asked him if he, or any one else of the family had asked him to make a will or a deed of trust, and he said, no ; he said, ' I made the deed myself, knew what was in it when I signed it,' and then he added that some one had said that his sister had influenced him, but he said there was nothing that could influence him, or anybody that could influence him at all, and that the only thing that could influence him was sickness ; and then he was asked the question *why did he not leave more to Fannie,* and he said that she was not affectionate and congenial and never had been from a child, and everything he did never seemed to please her ; he said that he only made one request of her, she wanted to go to some other city, Philadelphia or New York, and he had told her no, but she could do as she pleased ; that some day she would regret it, and she said she didn't want his money ; and then he was asked the question if he had ever ordered Fannie to leave the house, and he said yes, lots of times, and he was then asked if that had occurred within the last two years, and he said yes, lots of times.    Mrs. Frush came into the room during part of the conversation, and Mr. Frush he noticed her when she came in, and he kept looking at her all the time during the time she was in there ; that is, he followed her with his eyes." The witness was then asked, " who asked the questions of

Mr. Frush," and the witness replied, " Mr. George A. Hor-
ner." Upon cross-examination the same witness was asked :
" Did Mr. George Horner, during this interview, say any-
thing to Mrs. Frush ?" and he replied, " Well, he asked
her—he told her that she hadn't any right in the room ; no
he said, 'no one asked you to come in here;' he said,
' please retire.'" The two other witnesses go over about
the same narrative. Here then we have within twenty-four
hours before Mr. Frush died this remarkable spectacle : A
man on the brink of the grave, dying from a disease that
seriously impaired his mental faculties, sensibly under the
influence of opiates administered to allay his physical suffer-
ings, undergoing, at the hands of a person in whose integ-
rity he had publicly declared he had no confidence, a cross-
examination as to his reasons and motives for doing, four
days before, an act which, if unexplained, was, to say the
least of it, in itself exceedingly suspicious. After the secret
interview lasting ten minutes, during a greater part of which
Mrs. Leas was not present, the very first words he uttered
when the witnesses were brought before him and that were
not in response to some question or suggestion, were a cer-
tification to Horner's integrity. When did he make the
investigation about Mr. Horner's honesty and veracity ;
and from whom did he learn that he had all along before
been in error respecting Mr. Horner ? No line or sentence
in the record furnishes an answer Why did he follow Mrs.
Frush with his eyes when she entered the room ? And why
did George A. Horner request her to retire ? Was Luther
Frush then conscious that he had been drilled to say things
about his niece that were not true ; and was that look
towards that niece's mother a lingering but silent and help-
less protest against the words his tongue was unwillingly
uttering ? Was George Horner, when he requested Mrs.
Frush to leave the room, apprehensive that her presence
would rekindle sufficient intelligence or independence in the
dying man to change this plan of vindication into proof that
would crush the deed to atoms ? Who can tell ? But if

the witnesses were summoned to ascertain whether the deed was the result of Luther Frush's own free will and intelligence, and if Horner *knew* that there had been no undue influence exerted and *believed* that the grantor was in the full possession of his mental faculties, what possible reason could he have had for wishing to exclude Mrs. Frush from the room? Her presence could not have varied the truth. Not a question was put to him to test whether he knew what the contents of the deed really were. Such a course seems to have been studiously avoided. If it was designed to establish by these witnesses that Mr. Frush knew what he had done, what better or more satisfactory way of showing this than to have requested him to *repeat* the dispositions which the deed had made? The deed had previously been placed on record and its contents were not a secret, and there would, therefore, have been no impropriety in their being stated. Was the expedient left untried because it was *known* that it would fail?

The chief purpose of the gathering seems to have been to procure from Luther Frush his reasons for ignoring Miss Fannie. If she had had no claims to be an object of her uncle's bounty; or if there had been no reason to make it probable that her uncle would provide for her in the final disposition of his property; there was obviously no necessity for extorting from him, whilst the shadows of death were gathering around him, motives for the doing of an act that was a natural act for him to do. And just here the anxiety of Mr. Horner to bolster up the deed overreached his discretion, and the dying man gave motives for his conduct that are fabrications and not facts. Where an act unjust in itself, unexpected when the whole past conduct of the person doing it is considered, and utterly at variance with his asserted intentions consistently expressed, needs, in order to be upheld as free and voluntary, an explanation of the motives that induced its performance; if the motives assigned are in reality untrue and there is no pretence that there are any others, the conclusion is irresistible that the

act is a mere mechanical and not an intelligent act at all. If Miss Fannie was cut off for the reasons assigned by Mr. Frush in the presence of the three witnesses, and if those reasons were not real existing reasons, then she was cut off for no reason, and an intelligent agent cannot act without some reason.    It must be borne in mind that there is no pretence that Mr. Frush believed upon evidence of any kind the existence of these reasons as facts, though they were not facts. Such belief could exist as the result of deception.    As given by him through these three witnesses they are stated as facts within his personal knowledge ; and if, in reality, they are untrue we have a case where a man in failing physical strength and with impaired mental powers suddenly reverses the purpose of his life and assigns as an explanation for his conduct, when those who have become his chief beneficiaries seek to uphold his act by his own words, motives that he knows, if he is conscious at all, are utterly and entirely false. And in the face of such a condition a Court of Equity is asked to say that such an act is voluntary and intelligent.

He gave three reasons for disinheriting Miss Fannie ; and these were, first, that she was not affectionate and congenial and never had been ; second, that she had gone to Philadelphia or New York on one occasion against his wishes ; and third, that she had said she did not want his money. And then he added in response to one of Mr. Horner's questions, that he had often ordered her to leave the house. There is another reason, given through Mrs. Leas, and it is this, that Miss Fannie had asked her uncle for a piano. The first of these reasons is utterly without foundation in fact.    Apart from the interested witnesses there is not a human being who has testified that Mr. Frush ever dreamed that his niece was not affectionate towards him.    She was as dutiful as a child.    She washed his false teeth every morning ; washed his face, helped to dress him and frequently during the day cleansed his cancerous nose with a quill.    And this she did continuously until and including the day the deed was made.    She denies that she went to New

York or Philadelphia against his wishes; and she emphatically denounces as false the statements that she said she did not want his money.    It is a little singular that the sole act of alleged disobedience was so vaguely stated.    If the incident had ever occurred and had made an impression on Frush sufficiently strong to be a reason for disinheriting her, he would surely have remembered enough of the details to recollect the name of the city to which she had gone against his will.    We have said that many witnesses have given evidence that he spoke words of praise respecting her and that he expressed his intention to provide for her.    Some of these statements were made long *after* the alleged happening of the events which on his deathbed he assigned as the motives for cutting her off entirely.    Can it be possible that this man permitted this young woman to render him the services above but imperfectly indicated, if he had in fact repeatedly within two years before his death ordered her to leave his house?    The reasons given by him on the twelfth of July, to account for the execution of the deed made on the eighth, are false in fact and utterly trivial.    The one to which Mrs. Leas has testified is no less puerile.    That Frush should cut his niece off because she had asked him to give her a piano, and then in the very deed by which she *was* cut off that he should give her *that same* piano is simply preposterous.    But the reasons given by Mr. Horner to Mr. Donaldson on the eighth of July, as those which Mr. Frush had assigned for disinheriting Miss Fannie are utterly at variance with those which the witnesses say that Frush stated in their hearing on the twelfth.    Mr. Donaldson testified that when he took the original memorandum from Mr. Horner's hands, and saw that the piano was left to Miss Fannie, " I said to him, ' This is strange,' " and he said, " Well, Mr. Frush says she has been trying to *buy* his piano from him and had been after him for his money, &c., and that is the reason he has treated her in this way."    Why she should want to *buy* his piano from him at the same time she was importuning him to *give* it to

her; and why she should be " after him for his money" at the very moment she declared she did not want his money has not been, and cannot be explained.    If he believed these conflicting and these drivelling reasons that he assigned, to be true, he was manifestly laboring under palpable delusions. If he did not believe them to be true, then he assigned as reasons for his act things that did not exist and which from their contradictory character could not possibly exist; and he consequently had no reasons at all.    His act without reasons was either irrational or the result of an influence which he was too weak mentally to resist.

As soon as the deed of trust had been executed and placed on record a marked change in the household followed. Mrs. Sarah Frush was supplanted by professional nurses who were employed to do what neither Mrs. Green nor Mrs. Horner would or did do, but what Mrs. Frush and Miss Fannie had for months most faithfully performed.    Mrs. Frush no longer directed the domestic affairs, but the successful masters of the dying man assumed and asserted control.    Up to the time the deed was executed neither Mr. nor Mrs. Horner nor Mrs. Green remained over night at Frush's house.    After the deed had been signed some one of them or some one of Mrs. Green's children was always present.    " They never left him alone after that," says the colored servant whom the appellees produced as a witness. They evidently believed that a deed of trust could not be successfully assailed; and their whole demeanor indicated that they felt secure until the suggestion that the three witnesses ought to be assembled was made.    When these witnesses did appear the day before his death, Mrs. Green tells us in her testimony that Mrs. Frush put this question to them :  " Gentlemen, are you going to swear the rights away of a poor orphan girl," and that she, Mrs. Green, addressing Mrs. Frush, said: " Haman, stand back, stand back. You have made a gallows to hang me and my children on, and you have got your head now in the halter."    Obviously that halter was the deed of trust, and Mrs. Green gloated

over what it had accomplished. She evidently assumed that the devotion and attention shown by Mrs. Frush and Miss Fannie to Luther Frush during all his sickness and up to the time the trained nurses were employed, had sprung from a sordid hope of gain ; and when the deed had been procured and was as Mrs. Green supposed impregnable, she charged her sister-in-law, in the presence of strangers, with having built a gallows on which to hang Mrs. Green and her children—with having striven to get his estate—and she exultingly declared that Mrs. Frush's own head was then in the halter. If Mrs. Green meant that Mrs. Frush had resorted to sinister means with a view to deprive Mrs. Green or Mrs. Green's children of a share of Luther Frush's estate, she essentially implied that she herself had foiled her sister-in-law and had successfully availed of equally questionable methods to deprive Mrs. Frush and Miss Fannie of any share of that same estate.. But if there could be a doubt on this subject of undue influence Mrs. Leas set it all at rest in two interviews with Mrs. Classen. In the first, which took place on July the twelfth, the day before Frush died, Mrs. Leas told Mrs. Classen " they were going to have three or four gentlemen there *to bring it in* that *Mr. Horner hadn't persuaded Mr. Frush to do those things ;*" and on the sixteenth or seventeenth of the same month and three or four days after Frush had died, Mrs. Leas told the same witness " *about they had got exactly what they wanted,* that Miss Fannie was not to have anything but the piano, her having nothing else but the piano. "

We come now to the question of mental capacity. To render a deed or a will invalid because of the want of sufficient capacity to execute it, it is not necessary that the grantor or the testator should be insane. Where he fully comprehends the nature of the business in which he is engaged, and has sufficient capacity to make a disposition of his estate with judgment and understanding in reference to the amount and situation of his property and the relative claims of the different persons who ought to be the object

of his bounty, he is treated as being possessed of a testamentary capacity. *Davis* v. *Calvert*, 5 G. & J. 302. Whilst this is the general rule each case must in a great degree depend upon its own peculiar facts and circumstances. *McElwee* v. *Ferguson*, 43 Md. 484. The testimony of the attending physician is unequivocal and explicit that Frush was on July the eighth utterly incapable of making a valid deed or contract. Doctor Bevan was familiar with the man's physical condition and he knew that it had seriously impaired his mind. Such testimony from such a source is worth vastly more than that of the three witnesses who saw him the day before his death and who were total strangers to him ; and it outweighs the opinions of Brunt, and the magistrate and the other four witnesses who had stated that Frush was mentally competent to do what he did. Dr. Crim, who attended Frush before Dr. Bevan was called in, gives like testimony to that of Dr. Bevan, though covering a different period of time. And then Dr. Morris, the President of the Board of the State Lunacy Commission ; Dr. Hill, the physician in charge of Mount Hope Insane Asylum ; and Dr. Smart, the physician at the State Institution for the Feeble-minded, all concur after reading the testimony of the attending physician and the other witnesses adduced by the plaintiffs, in saying that Luther Frush was not possessed, when he made the deed, of sufficient mental capacity to make a valid deed or contract. And both Doctor Morris and Doctor Hill, when recalled after all the testimony on both sides had been delivered and after having read it all reiterated the opinions expressed in the first place. Dr. Bush, an expert called by the defendants, gave the opinion that Frush was competent, though he admits that if Frush was possessed of delusions respecting his niece, he was not competent to make an intelligent disposition of his property as respects her ; and he further admits in answer to the eighty-sixth cross-interrogatory propounded to him, that he expressed the opinion that *insane* people are competent to make wills.

It is a noticeable fact that the trained nurses who had been employed to take the place of Mrs. Sarah Frush were not called by the defendants to testify to Frush's mental capacity, though casual acquaintances who had met him but a few times in the last weeks of his life and who had never known him before, were placed upon the witness stand in behalf of these same defendants.

There is one witness and but one outside of the Green and Horner families and their servants and Mrs. Leas, who undertakes to give any evidence touching Frush's alleged declarations in regard to Miss Fannie, and that witness is Miss Dotterveich, one of the defendants. We feel constrained to place reliance upon the great preponderance of evidence that is in conflict with that of Miss Dotterveich. It seems most singular that Frush should have made the declarations that this young lady rehearses—evidencing great hostility to Miss Fannie—at the very time his conduct towards her and his treatment of his niece were the very opposite of that which would have been natural had he entertained the sentiments imputed to him.

We have wholly rejected the testimony of George Horner, the trustee, given in anwer to the general interrogatory. Mr. Horner was placed upon the witness stand by the plaintiffs under a *subpoena duces tecum*, requiring him to produce a certain paper showing the amount and details of the property which had gone into his possession as trustee. He was asked whether he had the paper, and upon his replying in the affirmative, the paper was produced and filed. The plaintiffs then dismissed him without asking a single question pertaining to the merits of the case. The defendants' solicitors then stated that they had no cross-interrogatories to propound ; but they requested the examiner to put the general interrogatory prescribed by Equity Rule No. 39. This was done and Mr. Horner proceeded, against the protest of the plaintiffs' solicitors, to give a circumstantial and detailed account of his acquaintance with Frush and his interviews with him and to testify, from written memorandum, fully and at large to the whole merits of the controversy.

Fourteen and a-half pages of the record are taken up with this one answer. Horner being a party to the deed was not a competent witness upon his own offer or upon the call of his co-defendants. We do not understand that it was the object of Rule 39 to supersede all other rules respecting the admissibility of evidence and the regular, orderly method of its introduction. Nor was it ever intended by the rule to throw wide open the door for bringing in irrelevant and incompetent testimony not germane to the subject about which the witness had been interrogated; nor to make competent an incompetent witness. If such is the effect of the rule—if it permits anything and everything a witness may himself judge to be relevant and material to be put on the record—it places in the power of a hostile witness the ability to spring a surprise upon the party forced to call him for a mere formal matter of proof. Especially would this be the case when the witness is an incompetent one under the law to give any testimony upon his own offer. It was said in *Blunt* v. *Strong*, 60 Ala. 576, "To such interrogatory no answer should be allowed of matter that is not germane to the subject of some special inquiry, and in a measure the complement of testimony previously given. To allow otherwise would be to permit interrogatories to become a delusion and a snare." The answer of Horner ought to have been suppressed.

For the reasons we have given, we think the learned Judge of the Court below was in error in dismissing the bill of complaint. And because, in our opinion, the deed of trust of July the eighth, was procured by the exercise of undue influence, and was executed at a time that Luther M. Frush was not mentally capable of making a valid deed or contract, the decree appealed from will be reversed and the cause will be remanded that a new decree may be signed annulling and setting aside the deed assailed in these procedings.

> *Decree reversed and cause remanded, the*
> *costs above and below to be paid out of*
> *the estate of Luther M. Frush.*

(Decided January 4th, 1898).