ALBERT N. HORNER AND MARY D. HORNER vs.
ELIZABETH H. BELL ET AL.

Cancellation of Deeds—Confidential Relations—Burden of Proof—
Capacity to Make a Deed—Undue Influence.

A man and his wife lived for many years with the mother of the latter
who depended upon them for personal attention and gave them her
confidence in business affairs.  When this woman was seventy-four
years of age, and a sufferer from organic heart disease, she executed
before a Justice of the Peace four deeds.  By two of them she conveyed
to a grandson and a grand-daughter, the children of a deceased son,
leasehold property of little value.  By the third deed she conveyed to
her daughter the goods and chattels contained in two dwelling-houses.
By the fourth deed she conveyed to her said son-in-law all her other
property, real and personal absolutely.  This last mentioned deed con-
veyed the bulk of the grantor's estate, which was of considerable value,
reserving no interest therein to her.  No provision by any of the deeds
was made for the grantor's only surviving son.  About a year afterwards
another deed professing to confirm these conveyances was made.  The
consideration expressed in the deeds was nominal and the grand-
children had no knowledge of their execution.  Upon the death of the
grantor, three years after their date, these deeds were placed upon
record.  Upon a bill by the grand-children against the grantor's daughter
and son-in-law to vacate and annul the deeds, held, that the evidence
shows that a confidential relation existed between the grantor and her
son-in-law; that the burden of proof to show that the deeds were the
free, voluntary and deliberate act of the grantor has not been met by
the defendants, and it is not shown as a fact that the grantor had knowl
edge of the contents and of the legal effect of the deeds; that it is
proved that the physical condition of the grantor at the time of execut-
ing the deeds was such as to unfit her for the transaction of business
without independent advice, and that consequently the deeds should be
vacated and annulled.

Appeal from the Circuit Court No. 2, of Baltimore City
(SHARP, J.)

The cause was argued before McSHERRY, C. J., BRISCOE,
PAGE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

Charles F. Harley (with whom was John B. A. Wheltle on
the brief), for the appellants.

Joseph B. Seth (with whom was Harry E. Mann on the
brief), for the appellees.

JONES, J., delivered the opinion of the Court.

This is an appeal from a decree of Circuit Court No. 2, of Baltimore City, which set aside and annulled certain deeds to which specific reference is made in the decree and the nature and purport of which will appear in the following statement of the facts which gave rise to the controversy involved in the case. Elizabeth B. Hammersley, a widow and a resident of the City of Baltimore, died in that city on or about the 4th day of June, 1902. In her life time she had been possessed of considerable property, real, leasehold and personal. About a week after her death, on the 13th day of June, 1902, the deeds dealt with by the decree in the case were left for record in the Clerk's office of the Superior Court of Baltimore City, which was the proper place for such instruments to be recorded, by Albert N. Horner, one of the appellants in this case. She left as her heirs and next of kin, a daughter, Mary D. Horner, one of the appellants, and wife of her co-appellant, Albert N. Horner; a son, William H. Hammersley; and two grandchildren, Elizabeth H. Bell, and George D. Hammersley, the appellees, who are the children of a son who predeceased her.

The deeds, which are the subject of controversy, four in number, all purport to have been executed and acknowledged by the deceased, Elizabeth B. Hammersley, on the 29th day of July, 1899, and were all left for record by Horner on the 13th day of June, 1902; and were noted consecutively as having been received at 2.15, 2.16, 2.17 and 2.18 o'clock, P. M. One of them conveyed to Elizabeth H. Bell, one of the appellees, "in consideration of five dollars and other good and valuable consideration," a certain leasehold property on Pearl street, in the city of Baltimore, for life on condition, "that she promptly pays all necessary expenses on said property within sixty days after their maturity;" and if this condition "be fulfilled then after the death of the said Elizabeth Hammersley Bell * * * to go to and become the property of each of the children of the said Elizabeth Hammersley Bell as may be living at the time of her death and to the descendants of any deceased child." But if there shall be a failure "to pay said

necessary expenses within sixty days after their maturity then the property" assigned by the deed "is to immediately vest in and become the property of Mary D. Horner, wife of Albert N. Horner, free of all trusts and uses," &c.

Another conveyed for a like consideration a certain other leasehold property on Pearl street, said city, to George D. Hammersly, the other appellee, for life upon the same condition that he pay all necessary expenses within sixty days after their maturity aud if this condition be fulfilled, at his death, the property "to go to and become the property of Mary D. Horner, wife of Albert N. Horner;" but upon a failure to comply with the said condition upon the part of the said George D. Hammersly the property was to vest immediately in the said Mary D. Horner "free of all trusts aud uses," &c. Another of these debts conveyed for a like consideration to the appellant, Mary D. Horner, "all of the personal property, goods and chattels and personalty contained in the two dwelling houses 108 North Green street and 2045 North Fulton avenue, this (Baltimore) city, therein belonging to the said Elizabeth B. Hammersly. "To have and to hold" &c., "absolutely." The fourth one of the deeds in question is a conveyance to the appellant Albert N. Horner in the terms following" in consideration of five dollars and other good and valuable consideration the said Elizabeth B. Hammersley doth hereby grant, assign and convey unto the said Albert N. Horner, his heirs, personal representatives and assigns all. of the real estate, fee-simple, leasehold, ground rents and all other property and evidences of debt due of all kinds and description not mentioned in a personal property goods and chattel deed priorily executed by me—this shall include all notes, book accounts and insurance policies and all persons and corporations are hereby authorized to accept a certified copy of this paper as full authority and acquittance to them and this paper shall be a full release to them as against all other claimants at law or in equity the purposes and intent of the deed being to make an absolute grant of all the estate (not before deeded) of myself Elizabeth B. Hammersley, and to include

all the property deeded to me by my late husband, David L. Hammersley, deceased, to Albert N. Horner. To have and to hold all of said property to the said Albert N. Horner, his heirs, executors, personal representatives and assigns with all the right and appurtenances thereto belonging," &c.

The appellees, as soon as they became aware of the deeds in question having been left for record filed the bill in this case in the Court below to have them set aside and annulled, alleging that they knew nothing of the said deeds "until they saw the notice of their having been recorded in the daily newspapers;" that the deeds purporting to have been executed to them were never delivered to nor accepted by them; that the property pretended to be conveyed to them was subject to heavy ground rents, was in a dilapidated condition, was located in a part of the city "which is steadily deteriorating in value" and that it was comparatively of "little or no value while the estate and property so pretended to be conveyed to the said defendants, Albert N. Horner and Mary D. Horner, is of very large quantity and value;" that the deeds to the appellants were never legally delivered to them in the life time of the grantor; and that if the said deeds were executed at all by the said deceased they "were never intended to take effect in her life time and are therefore null and void." They further charged that "Elizabeth B. Hammersley was advanced in age, being seventy-seven years old, and was not only infirm in body, but was also for a long time before her death, and at the time when said paper writings are alleged to have been executed, enfeebled and impaired in mind to such an extent as to render her unfit for the transaction of any business and wholly incapable of making a valid deed or contract; that she was particularly susceptible to influences surrounding her, and residing with the said Albert N. Horner and Mary D. Horner, her feebleness and incapacity were taken advantage of by them, and she was induced, influenced and persuaded by said defendants * * * through fraud, misrepresentation and undue influence practised by them to sign said paper writings," &c. The question is whether upon the record be-

fore us these allegations of the appellee's bill are so far sustained as to justify the decree which is here under review. And this question is largely one of fact as to which we are not aided by any direct proof going to the charges made in the bill as grounds of relief; but the irresistible inferences from the disclosures of the record leave no doubt as to the propriety of the decree. In reaching our conclusions the testimony which has been made the subject of exceptions has been laid out of the case. It will not be necessary therefore to notice these exceptions further. With the bill, making the allegations that have been set out, there were filed as exhibits certified copies of the deeds it assailed; and from these in connection with admitted facts already recited, it appears that the grantor in the deeds, Mrs. Hammersley, conveyed away, and divested herself, of all of her property of every description—reserving to herself no part thereof nor any interest therein; that the only specified consideration for this was a nominal one, that in making this disposition of all of her property, none was granted to her only living son; that but a comparatively insignificant part was granted to her grandchildren, who, next to her son and daughter, had naturally the strongest claim upon her bounty; that what was conveyed to the grandchildren was hampered with an embarrassing and drastic condition; that the conveyance to her daughter, embraced only the personal and household effects in the two dwelling-houses named in the conveyance to her; that all the rest of her property of every description was in terms admitting of no exception granted to her son in-law; and that to emphasize the unnatural character of the disposition made of her property by the deeds in question it appeared that the property thus disposed of had been conveyed to her by her husband whose children and grandchildren received such small consideration at her hands.

The deeds in themselves give no explanation of, and suggest no reason for, the remarkable dispositions of the property which they make. Confronted with such charges thus made, and with disclosures thus appearing, it became the duty of

the defendants by their answer to meet them with a full, frank and direct statement to the Court of all the facts and circumstances within their knowledge connected with and attending upon the transaction called in question that it might be seen in its true and real character; and there is no reason to doubt that they would have met this duty if they had seen in such facts and circumstances what would have gone to refute the charges made; and to explain conditions calculated to excite suspicion and to give rise to unfavorable inferences. The answers of the defendants (appellants) do not measure up to this standard of duty and just expectation. They content themselves with answers of a very perfunctory character. These answers are evasive and make only general, categorical and formal denial of the charges in the bill and are framed, if not with the purpose, at least with the effect, to make the burden of the plaintiffs (appellees) with respect to proof as difficult as possible. The plaintiffs (appellees) accompanied their bill with special interrogatories appended thereto and what has been said of the appellant's answers to the bill is equally true of their responses to these interrogatories. The attitude of the appellants before the Court, upon the pleadings, to which reference has been made, is the more significant because an inspection of the proceedings in the cause makes it entirely manifest that they possessed information in reference to the transaction that these call in question which they have not chosen to disclose.

We proceed to examine the transaction in controversy in the light of the proof. There is open no question as to its nature. The appellant, Albert N. Horner, in answer to one of the special interrogatories said "the deeds were in the nature of a gift, although I paid considerable sums for her (Mrs. Hammersley's) account; I lived with her thirty years; our relations are very friendly; and my purse was always open to her." The exorbitant character of the gifts is made manifest by what appears on the face of the deeds which shows that the donor stripped herself of all of her property of every kind, and placed herself in a position of absolute dependence if the pur-

porting intention of the deeds was to be given effect.    Of this property the great bulk of it passed under the deed to Albert N. Horner.    The appellees were to take what has already been mentioned.    The property embraced in the deed to Mary D. Horner was admitted by the appellants to be of the value of four hundred dollars.    Besides the property embraced in the deeds to Mrs. Horner and the appellees the grantor is shown, by the admission of the appellants, to have been possessed at the time of the execution of the deeds of five houses and two ground rents in good localities in the city of Baltimore; and there was evidence going to show she also had valuable securities to the amount of four or five thousand dollars.    A pertinent inquiry now is what was the relation between the grantor and the other parties to the deeds in question at the time they purport to have been executed and what connection such other parties had with their execution.    It is not shown that the appellees had any connection with, or knowledge of the making of the deeds until they were filed for record.    The appellants, both admit that they were present with the grantor at the signing and acknowledging of the deeds and that the only other person present, or who is named as being present was the Justice of the Peace who took the acknowledgments.    Mrs. Mary D. Horner was the daughter of the grantor, and she and her husband and co-appellant had, before the time in question, resided with her in the home of the grantor for about thirty years.    This appears by the admission of Albert N. Horner.

It further appears from testimony upon the part of the appellants, from the physician who attended her, that Mrs. Hammersley, the grantor in the deeds, was, for several years prior to her death, an invalid suffering from organic heart trouble. This same witness, testifying for the appellants, said "Mrs. Horner lived in the house with her mother; nursed her day and night; and in all manners discharged the duties of a loving and affectionate daughter.    Mrs. Hammersley impressed me as being measurably dependent on Mrs. Horner. She preferred the attentions of Mrs. Horner to that of her

nurse, whoever the nurse might be." This witness further testified that the feelings of Mrs. Hammersley towards Mrs. Horner (appellant here) were those "of a mother to her child, affectionate and sincere;" and that "Mr. Horner (appellant) was a resident of the same home. His attentions to Mrs. Hammersley were those of a son to a mother, and on the part of Mrs. Hammersley she invariably spoke of him or to him in the most respectful and affectionate manner." Such were the general relations between the grantor, Mrs. Hammersley, and the appellants at the time the deeds in question were executed; and these are shown to have been close and intimate from family ties and long association and as involving a peculiar dependence of the grantor upon the good offices of the appellants by reason of her feeble and failing health. This same witness testified in chief for the appellants that in July, 1899, the month in which the deeds in question bear date, that Mrs. Hammersley was very ill; that he then visited her "probably twice a day"—thus showing a condition calling especially for nursing and care; and emphasizing her dependence upon the appellants at the particular juncture of time when it becomes of most importance as a circumstance in this case. This evidence goes to show that when the deeds were executed the grantor was not in a condition physically to transact business of that character without and co-operation from some source. It is not shown that she had advice or assistance from others than the appellants; and they were with her and in a position to make suggestions, give advice and aid her in carrying the business through.

It is not shown who wrote the deeds; nor who notified the Justice of the Peace and procured his attendance. It *is* shown that the appellants were with her at the time in question—one of them acting as a witness; that with the Justice of the Peace who took the acknowledgments of the deeds the grantor was not known to have ever had business transaction before; that this official was one who had been frequently employed by Albert N. Horner to act in his official capacity for him; that immediately upon the execution of the deeds they were given

or passed into the possession and custody of Albert N. Horner; that he advised that the deeds be not placed on record at the time, but that they be withheld for the purpose of preventing some of the beneficiaries from becoming aware of their execution and this advice, as affirmed by the appellants, was followed; that he also advised that, notwithstanding the deeds, the grantor should continue to collect rents from the property and this advice was followed; that he retained the custody of the deeds from the time of their execution till the death of the grantor a period of about three years; that at her death he, without notice to, or consultation with anyone, delivered the deeds for record; and that in leaving them for record he felt himself authorized to instruct as to the order in which they should be placed upon record.   Now all this appears from the admissions of the appellants or from evidence which they do not dispute; and if it be true that the deceased grantor, in the deeds in question, placed these instruments, which she adopted and used as a means of disposing of the whole of her property in the custody and control of Albert N. Horner with authority to him to see that they were given effect, and in the meantime was acting under advice from him in regard thereto there was undoubtedly between the deceased grantor in the deeds and Horner, in respect to this transaction, a relation of trust and confidence of a grave and responsible character.   The appellants are surely in no position to deny or repudiate such relation.   And the inference seems inevitable from the circumstances surrounding the parties, at the time that prior, and subsisting, to the execution of the deeds in question there must have been, in respect thereto, as between the parties, a relation of agency on the part of the appellants and of confidence on the part of Mrs. Hammersley.   Mrs. Horner testified, "I knew my mother's every thought," and when asked whether she knew that the deed from her mother to herself "was to be prepared beforehand," answered "I heard mother speak of it."

It would seem from this review of the evidence in the cause as to the character of the transaction, here in question, and

the relations of the parties thereto and to each other in con-
nection with it, that it is clearly brought within the principle
recognized and applied in a number of cases in this Court and
notably in the recent case of *Zimmerman* v. *Bitner*, 79 Md.
115, that when "a gift or conveyance" such as here is the sub-
ject of controversy "is in question, the *onus* is upon the donee to
prove to the satisfaction of the Court that the conveyance was
the free, deliberate and voluntary act of the donor, and made
by him with full knowledge as to its effect and operation;
in other words that he knew that the conveyance itself oper-
ated to divest him of all title to the property, and to vest it in
the donee." After laying down this principle the case just cited
goes on to say "a good deal has been said as to what consti-
tutes a confidential relation within the operation of the prin-
ciple. but courts have always been careful not to fetter the
operation of the principle by undertaking to define its precise
limits. The cases of parent and child, guardian and ward,
trustees and *cestui que trust*, principal and agent, are. familiar
instances in which the principle applies in its strictest sense.
But its operation is not confined to the dealings and transac-
tions between parties standing in these relations, but extends
to all relations in which confidence is reposed, and in which
dominion and influence resulting from such confidence, may
be exercised by one person over another. No part of the
jurisdiction of the Court, it has been said, is more useful than
that which it exercises in watching and controlling transactions
between parties standing in a relation of confidence to each
other. And being founded on the principle of correcting
abuses of confidence, it ought to be applied to every case in
which a confidential relation exists as a fact,—where confi-
dence is reposed on the one side, and the resulting superiority
and influence on the other." For a statement of the same
general doctrine as is outlined in the foregoing citation we
may refer to 1 *Story's Eq. Jur.*, sec. 323.

The defendants seem to have sought to meet the burden of
proof cast upon them, by the rule of law just adverted to, in
their responses to certain of the special interrogatories ap-

pended to the bill of complaint. Of these No. 3 to Albert N. Horner asked him to "state when and under what circumstances said alleged deeds came into your possession or the possession of your wife." To which he answered "the deeds were delivered to me and accepted by me upon the date of their execution by the grantor. The whole transaction emanated from her without any suggestion on my part; and it was her free and voluntary act." And interrogatory No. 3 to Mary D. Horner asked her to "state when and under what circumstances said alleged deeds came into your possession or the possession of your husband." To which she answered "the deeds were delivered to my husband, Albert N. Horner, by my mother on 29th July, 1899; and it was the free and voluntary act of my mother after careful and deliberate consideration." These answers were evasive and were not "directly responsive," to the interrogatories. The inquiries called for the facts and circumstances attending the transaction indicated. The answers did not give any facts and circumstances, but a conclusion that might or might not be drawn from these. They gave what the respondents claimed to be the effect and result of a knowledge of the facts and circumstances to which the inquiries related. These answers therefore "not being responsive to the bill" unless "sustained by the proof, at the final hearing of the cause * * * are entitled to no consideration." *Gardiner et al.* v. *Hardey et al.*, 12 Gill & Johnson, 365; *Code* (1904), Art. 16, sec. 160.

Now what evidence did the appellants produce at the final hearing to support the averments made in these answers? The only evidence from them which appears as being intended to meet the particular inquiry now under consideration consists of certain papers filed with the examiner as exhibits under an agreement of counsel that the appellant, Mrs. Mary D. Horner, who was absent by reason of illness, would if present, "testify that she was present and saw Mrs. Elizabeth B. Hammersley sign and execute each and all of them" at her home, No. 108 N. Green street, upon the dates mentioned in said papers; that at the signing of the papers dated July 29th, 1899,

Mrs. Elizabeth B. Hammersley, Albert N. Horner, Andrew J. Collars and Mary D. Horner were present; and that at the signing of the papers dated February 14th, 1900, Mrs. Hammersley, Mr. Collars and Mrs. Horner only were present." These papers are offered without any explanatory or accompanying evidence whatever beyond that just alluded to that they were signed by Mrs. Hammersley and are left, for the effect they are to have in the cause, to rest on the presumption arising from the bare fact that they were signed, and such evidence as they intrinsically afford. There were the apparent means and opportunity for the appellants to have furnished this explanatory evidence, the importance of which will be presently seen, for, although it is shown that Andrew J. Collars is dead, Mrs. Horner, the other witness who was present on both the occasions mentioned in the agreement and saw all of the papers signed, according to her testimony, was twice on the stand, in the course of the proceedings below as a witness—once when called by the plaintiffs and again on the call of the defendants (appellants).

These papers are worthless as proof in the cause in discharging the burden of proof the appellants are called upon to gratify, as has heretofore been pointed out, and only serve to arouse suspicion and to give suggestion of fraudulent contrivance. One of them was executed, or purports to have been, on the 29th of July, 1899, and is as follows: "This memoranda or paper is to certify that whereas I have made certain provision for George D. Hammersley and Elizabeth Bell (wife of John Bell) my only grandchildren, and by way of explanation why these bequests are not more, I have to say that George W. Hammersley, my son (now deceased), received during his life time house rent free for about 20 or 25 years, amounting to five or six thousand dollars, in addition one or two insurance policies on his life. The premiums or assessments were nearly always paid for by myself, from my individual purse, or that of my husband. And these policies were paid to the above-named grand children. All this was in addition to his weekly salary for his services. This statement

is made in order that I show that I have not been illiberal with them. And what Mary D. Horner may do for them in future is left with her to use her own free will, discretion and judgment.

"Witness my hand and seal this 29th day of July, 1899.
"(Sworn to, &c.)      Signed, E. B. Hammersley (seal)."

It may be said of this paper·in passing that in itself it gives no evidence that Mrs. Hammersley had knowledge of the character and effect of the instruments she is alleged to have executed on the day it bears date. On the contrary it would indicate that she did not have such knowledge. The paper speaks of "bequests" and not of deeds to take immediate effect. It also indicates that there was in her mind some idea of Mrs. Horner doing something for the grandchildren in the future which is inconsistent with the knowledge that the transaction in question here had given to Mrs. Horner a mere pittance and left her powerless to help anybody. Again while it mentions considerations that might reasonably have had effect in distributing the property as between her children and her grandchildren it is far from the suggestion of a reason why practically all of her property, acknowledged to be considerable, should go "in the nature of a gift" to Albert N. Horner to the entire exclusion of one of her children, and to the putting of herself in a state of absolute dependence.

Others of the papers, or exhibits, to which reference is now being had, are four deeds and a paper referring to the deeds as confirmatory of those of the 29th of July, 1899. These confirmatory deeds all purport to have been executed and acknowledged on the 14th of February, 1900, and are identical in every respect, excepting only dates of execution and acknowledgment, and being witnessed alone by Andrew J. Collars instead of by both Mrs. Horner and Collars, with the deeds of the 29th of July, 1899. The paper just mentioned as referring to the deeds as confirmatory bears the same date as the deeds and is as follows: "Whereas on the 29th day of July, 1899, I executed sundry papers qualified to them before Justice Andrew J. Collars, J. P., and now I again execute confirmatory

deeds of them and sundry other papers confirming those first signed in July, 1899, and hereby confirm and affirm each and all of them as being my own opinion in writing—my suggestions in writing, my hope and expectations.   I have made no will.   These affidavits and suggestions are specifically not intended to be a will, and are not to be so construed under any circumstances to be a will in any sense whatever.   And while I am aware the way I have disposed of my property which suits me, if it is contested by any person or persons this writing and suggestions and requests, will to the legal mind in order to thwart the end I wish to accomplish, look suspicious of future trouble and by employing fine points of law, citing of authorities on insanity, old age, collusion, and my yielding to persuasion of others, and by oratorical effect seek to have my deeds and papers annulled; my only reason for such forestallment of what might occur, is the already and before this date, attempted connivance with my own offspring to frustrate what may be arranged by me for the welfare of them that will in all human probability live after I am no more.   This feature of intention to try to annul anything I may do has already come to my knowledge, and for me to prepare for such a contingency is only common sense.   I have deeded my property to others for a consideration, as deemed best by me, that no one understands as well as myself and to avoid any of my family matters being aired in Court is surely a privilege that is, to say the least, proper and reasonable and all Courts of law and equity, and all Judges and juries that may in the course of events be called upon to hear contests of the deeds excuted, or pass jndgment upon these papers or deeds executed, and qualified to by me at this date while I am sound in mind are hereby requested to uphold the same to the letter, no matter ' by whom assailed.   This paper has been, as well as all other papers before signed and now signed, in my possession for many hours, yes days, and with assistance have expressed my own ideas fully I believe.   I have read them over and over and I am fully cognizant of their import and effect and I hereby suggest, request and implore, that no Court of justice, law or equity will annul or change them.

Witness my hand and seal and affidavit to the same this 14th day of February, A. D., 1900.

(sworn to &c.)     (Signed)   Elizabeth B. Hammersley (seal)"

The two accessory papers which have been fully set out appear to have been sworn to. Why they should have been executed and with this solemnty, is not attempted to be explained except by the vague suggestions in the papers themselves, and it does not appear that there was the slightest foundation for the intimations contained in the papers of 'the purpose of their existence beyond the imagination and the fears of their author. If the transaction to which they related was the free, uninfluenced, voluntary and deliberate act, that the appellants claim it to have been, much less secretive and suspicious, and more effective means could have been employed to make this appear. A circumstance having significance in connection with these papers appears in the evidence. Mrs. Horner, as a witness, was asked if her mother (Mrs. Hammersley) had at the time of the making of the deeds in controversy, made any provision for her (Mrs. Hammersley) son, William H. Hammersley, and answered "No"—asked further if he, the son, was not at the time "almost wholly dedependent upon his mother for his support," she answered "he was." Being then asked "How has he been supported since her death" she answered "by what I give him." This shows William H. Hammersley, the son, to be a dependent upon Mrs. Horner and her husband (appellants.) It is to be observed that in the papers, now being considered as the principal evidence of the appellants, no explanation is thought necessary to be made why, in making disposition of her property, Mrs. Hammersley should altogether have ignored her son William, while care is taken to explain why she was not more liberal with her grandchildren.

The radical defect, however in the papers in question as proof, to the point upon which they were offered, is, that it no where appears in evidence that the deeds, involved in the controversy here, were ever, as a matter of fact, read by, or read to the grantor; and these papers do not upon their face indi-

cate that Mrs. Hammersley had knowledge of the contents of such deeds by any reference to such contents. General and vague reference is made in them to instruments executed and provisions made; but they give no information of what the instruments contain or what provisions had been made. Upon the assumption therefore that she read over the papers now being discussed she might have had in mind, as far as here appears, very different provisions in reference to her property from those which the deeds made. The futility of this evidence is enforced by the fact that it is not shown as a fact, but merely as a presumption, that she knew what was expressed in the papers we are now considering.

With the exception of the evidence which has been adverted to there is none in the record even designed to show that, prior to the execution of the deeds in controversy, Mrs. Hammersley ever expressed an intention to dispose of her property as the deeds disposed of it; or that after the deeds had been executed she ever expressed or indicated a knowledge of how she had disposed of it. It is not perceived just what office the so-called confirmatory deeds were intended to perform. The execution of these deeds to confirm the deeds previously made would seem to be an admission, or would indicate a fear, upon the part of somebody, of infirmity in the prior deeds. The execution of the confirmatory deeds, and of the paper in connection with them, indicated a good deal of anxiety and pains on the part of somebody to cure such infirmity. The inquiry naturally arises why this anxiety and pains on the part of Mrs. Hammersley to confirm and render secure a transaction which left a dependent son penniless, and gave comparative pittances to her daughter and grandchildren and nearly all of a considerable property to a son-in-law.

We search the record in vain for any explanation of this; or for any reason impelling or inducing Mrs. Hammersley to such an act. It is pregnant however with motive and inducement for the appellants to have been at this pains. If there was infirmity in the deeds of the 29th of July, 1899, and the confirmatory eds of the 14th of February, 1900, were nec-

essary to confirm and complete the transaction of the former date, then the "gift" which was intended to be made by Mrs. Hammersley was really made by the deeds of the later date. At that time there could be no doubt of the confidential relations existing between her and the appellants nor of the agency of Albert N. Horner in respect to the transaction which was thus perfected. He had had, at the time, for months, in his keeping the instrumentalities for disposing of the whole of her property and was guiding her by his advice in relation thereto. The same burden of proof that the appellants would have to gratify to establish the deeds, which were set up as the effective deeds, would devolve upon them with respect to the so-called confirmatory deeds in the attempt to give these latter instruments effect. All that has been said with respect to the proof in the case applies as well to the so-called confirmatory deeds as to those originally executed. We do not think it necessary to extend this already lengthy opinion to present other considerations suggested by the record and going to show the propriety of the decree here appealed from. We approve of the decree and the same will be affirmed for reasons we have given.

*Decree affirmed with costs to the appellees.*

(Decided January 10th, 1906.)