# WILLIAM MILLS ET AL *v.* STRAN GLENN, ADMINISTRATOR PENDENTE LITE.

*Deed — Fraud and Undue Influence — Evidence — Rights of Innocent Mortgagee.*

A deed made by an elderly and infirm colored woman, to persons who had lived with her free of expense for several months, of the property occupied by her and her husband, without any previous consultation with the husband, who had in large part paid for the property, and without the receipt of any consideration from the grantees, *held* to have been procured by fraud and undue influence.            pp. 465-470

A decree setting aside a deed as procured by fraud and undue influence is not defective because it fails expressly to save the rights of one who took a mortgage from the grantee without notice of the grantor's equity, the mortgagee not having been made a party and the mortgage not being assailed.            p. 471

*Decided March 23rd, 1927.*

Appeal from the Circuit Court of Baltimore City (FRANK, J.).

Bill by Stran Glenn, administrator *pendente lite* of the estate of Kate Glenn, deceased, against William Mills and Mamie Mills. From a decree for plaintiff, defendants appeal. Affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*John Holt Richardson* and *Allan W. Rhynhart,* for the appellants.

*W. Leslie Prout,* with whom were *Tolson & Tolson* on the brief, for the appellee.

Bond, C. J., delivered the opinion of the Court.

The appeal in this case is from a decree setting aside a deed because procured by fraud or undue influence. The grantor, Kate Glenn, was a colored woman, seventy-one years of age, crippled and infirm, so that she was much disabled, walked with some difficulty, was compelled to go upstairs on her hands and knees and to come down backwards, and was physically much dependent upon the aid of others. There was some testimony offered to show mental incompetency, but in our opinion it fails to establish it. The woman appears to have been illiterate, or, at least, she depended upon others to write letters for her. She held in her name the leasehold estate in a house and lot in Baltimore City, valued at $4,500 or $5,000, which she and her husband had paid for jointly about seventeen years before, and in which they both lived up to the time of her death. The husband testified that he made all, or nearly all, payments on a mortgage placed on the property at the time of the purchase. Four rooms were rented to boarders and appear to have brought the wife in a weekly income of between nine and eighteen dollars. Testimony was offered to show that the woman and her husband were not on good terms, but, apart from a statement inserted in a will which she executed, there was no substantial proof of it, and there was contradictory evidence. We infer from the whole evidence that the relations between the two were ordinarily good. He appears to have contributed to the household expenses, and to have aided the wife otherwise; and he paid the funeral expenses.

The husband's employment as a barber kept him away from the house during most of the day, and at night, so that the wife was left alone to attend to whatever needs might arise, as well as to care for herself; and in February, 1924, which was six months before her death, she suggested to her husband that they take somebody else to live in the house with them, and to aid her by answering the door-bell, and generally attending to whatever might be needed. He consented, and told her to get any one she wanted, and the appellants, William and Mamie Mills, were brought in. Wil-

liam Mills had boarded at the house for short periods in the past when he was in Baltimore; he testified that he had kept and paid for a room there even when he was away for long periods, working at Atlantic City, but this is contradicted, and we think is not proved. Mamie Mills, after she came to live in the house, took complete charge of it, doing all the housekeeping and the marketing, collected the rents from the boarders, aided Kate Glenn in the care of herself, taking her to church and to call on friends while able. Just what was the general relation which resulted between Kate Glenn, and Mills and his wife, is not made any more definite by direct testimony. Glenn did testify, however, that at one time he felt there was something wrong, and called his wife and Mills into the bedroom and asked each if there was not something wrong going on between the two and kept secret from him, Glenn; and each denied that there was any such thing. What impelled Glenn to ask the question was not brought out. The sum of the testimony on the general relationship between Kate Glenn and Mills and his wife, then, is that the Glenn woman was largely disabled, and physically dependent upon Mills and wife for much of the care needed by herself and her affairs about the house, and that there was some undescribed appearance of secret dealings.

On April 21st, 1924, two months after Mills and his wife came to live in the house, Kate Glenn, unknown to her husband, executed a will in which she left the house and all the residue of her property, except three small bequests, to Mills, describing him as "my good friend who has helped me so much in times of distress." To her husband she requeathed twenty-five dollars, explaining that he had been "of no aid or service to me, in helping me to accumulate my property or otherwise." The will was prepared by an attorney who went to the house, upon a message left with him by a Mrs. Young, not concerned in this proceeding, took notes of the directions of the testatrix, and ultimately had her execute the finished will at her home. He left a duplicate with her, and kept the original. Neither Mills nor his wife

was present when the will was executed. The witnesses were Thomas Smith and a brother of the attorney. The attorney testified that he explained to the testatrix that her husband could, under the law, take his full share of the estate left by her, despite the provisions she was making in her will.

Two months later, or on June 25th, 1924, the decedent executed the deed of the house to Mills and wife, and on the same day these grantees executed a mortgage to secure a loan of $1300 on the property, from the Downtown Building and Loan Association. This was also done without the knowledge of Glenn. Mills, representing Kate Glenn, arranged the loan, and had the deed prepared, received the $1300, expended in the neighborhood of $1000 in repairs and improvements on the property, such as the installation of electric lighting and furnace heating, and gave the remainder, about $250, to Kate Glenn. But the deed to Mills and wife was taken to the grantor by the secretary of the building association, and the latter fully explained the transaction to her. Kate Glenn replied that the house was in bad condition and had to be fixed up, that this was the only way to do it, and that she wanted to give the property to Mills and his wife so that it could be fixed up and she, the grantor, would have a decent place to live in; and she added that Mills and his wife had been like children to her and had taken care of her. She was very determined in her directions. Mamie Mills was present at the execution of the deed. There was further evidence of explanations by the grantor to others, that the grantor made the deed to Mills and wife because of the need of repairs, and the inability of her husband to pay for them, and because her health required that she have some one to do for her, and Mills and wife came when sent for, and received no pay for what they did, so that it was her duty to make the house over to them. To a witness, May, who had been a familiar visitor and a boarder at the house, she said that Mamie Mills had persuaded her that steam heat would be lots better than suffering from the gas that came from the other kind of stove, and

Mamie and Mills had told her she was getting old and might as well have these comforts before she died, that she protested she would never be able to pay for them, and Mills had agreed to pay a portion of the cost, that Mills arranged the borrowing of the money and attended to it all, and she had nothing to do.

On the death of Kate Glenn, in August, 1924, Mills came from work in Atlantic City upon receipt of the news, and when he and the husband and others were together at the house, there was talk of giving some of the effects of the deceased to relatives, and then Mills announced that everything belonged to him, and nothing could be taken away. Mills and his wife had, in a box, the duplicate will and two hundred dollars of the money from the mortgage, which, as they testified, Kate Glenn had asked them to put aside to be given to her sister.

The question in the case is one of fact, whether upon this evidence procurement of the deed by fraud or undue influence has been established. Arguments have been presented on the subsidiary question of the burden of proof on the point, especially on the question whether the grantees had the burden upon them because of their standing in a relation of trust and confidence to the donor, and under a duty of protecting her interests, so that they must disprove any fraud or undue influence in taking an advantage or profit from her (*Taylor v. Pivec,* 149 Md. 526, 531); but we think on the facts shown the placing of the burden of proof is without decisive importance. Those facts and circumstances seem to us to prove the fraud or undue influence sufficiently. There is no direct testimony of the exercise of it in this case, but procurement of a deed by fraud or undue influence may, of course, be proved by circumstances. *Longanecker v. Sowers,* 148 Md. 584, 587. And as circumstances tend more or less to prove it, the need of direct testimony will vary. *Story, Equity Jurisprudence,* sec. 351; *Chesterfield v. Jansson,* 1 Ves. 155.

The grantor here was a woman so situated in life that the

provision of a home, for her old age especially, would naturally be a subject of anxiety; and a home owned and secured would not be lightly given away. This home had been bought by the savings of her husband and herself, she was now old and no longer able to work, and it seems to us there is a strong likelihood that her own free and uncontrolled will would be to keep the house in her ownership and control during the remainder of her life, and to continue it as her husband's home, as well, during their joint lives, and during his life if he survived her. It appears very unlikely that of her own free will she would dispose of it without receiving any considerable part of its value, thus throwing herself and her husband in their old age, and in her extremity, upon the benevolence of others for a home, and, in part, for support. Here, as in *Cherbonnier v. Evitts,* 56 Md. 276, 293, the relations of the grantees to the grantor "were, if not 'confidential' in the strict sense of the term, such, nevertheless, as the law regards with scrutiny." They were living in intimacy with her, and she was much dependent upon their care. They were in a favorable position for obtaining an unfair advantage, if they desired, and if it could be done. See *Hammersley v. Bell,* 134 Md. 172, and *Horner v. Bell,* 102 Md. 435; *Grove v. Spiker,* 72 Md. 300. And when we find them, within two months of their coming into the house, and taking charge as they did, made legatees of substantially all her property, and then, two months later, made grantees in a deed of the chief portion of the same property, thus stripping the woman and her husband of all ownership in their home from that moment; when we find, further, that all this was done with the knowledge of the legatees and grantees, and the deed and mortgage arranged by them, but without the knowledge of the husband of the woman, with whom we have seen her consulting on her need of having some one come live in the house with them, and with whom we should infer she would naturally consult on other important decisions; when we see these transactions, with these incidents, following the placing of Mills and his wife in the position they occupied, we are satisfied that they took advantage of that

position to impose their will on the grantor, and thus obtained the deed complained of.

Other facts seem to us to confirm this conclusion. We believe the grantor would not, of her own initiative and volition, have followed a will with a deed of the property already bequeathed; we doubt whether she would have thought of the expedient, or would have understood the meaning and purpose of it. The explanations given for the decedent's act, or explanations which the grantees repeat as given by her, seem to us explanations which could hardly have emanated from her, and which give reasons that could hardly have led her to make the deed. It was, of course, unnecessary for her to convey to Mills and his wife in order to raise the money for improving the property; and as she was conveying it to them, it would be their property that was to be improved, not hers; and the sum of this explanation is that she was giving the property away upon a promise of the grantees to improve it; and let her live in it with them. And there seems to be a great disparity between any sense of obligation the grantor could have felt to reward the grantees for their care, and the absolute gift of the house of $4,500 or $5,000 in value for the reward, especially when we consider the consequences of the grantor's loss of ownership of her own and her husband's home. The grantees had been in the house only four months when the deed was executed, only two months when the will was made; and their services were not therefore very great as yet. And it would seem that, however great the decedent thought them, she would have considered the grantees sufficiently rewarded by the will, without a deed for the same property superadded. The grantees, moreover, had been provided with living accommodations, and no room rentals appear to have come from them. And in the talk between Glenn and his wife about bringing them into the house, no other compensation seems to have been contemplated. These explanations of the transaction seem to us rather attempts to cover the real origin of it. We agree in the conclusion of the trial court that the deed should be set aside.

The appellants argue that the decree should be reversed in

any event because it fails to save the rights of the mortgagee as a *bona fide* purchaser without notice of the grantor's equity. The mortgagee was not made a party, and its mortgage stands unassailed, and the lien survives the vacation of the deed as to the mortgagors. *Houston v. Wilcox,* 121 Md. 91; *Wicklein v. Kidd,* 149 Md. 412; *Reilly v. Reilly,* 63 App. Div. 169, 71 N. Y. Supp. 287; *Manhattan State Bank v. Mc-Laren,* 112 Kan. 538. There was no need of an express reservation of the lien.

*Decree affirmed, with costs to the appellee.*