## CLAYTON M. ZIMMERMAN *v.* MAMIE E. HULL.
[No. 40, January Term, 1928.]

*Decided April 19th, 1928.*

The cause was argued before BOND, C. J., PATTISON, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Jacob Rohrback* and *Holden S. Felton,* for the appellant.

*Leo Weinberg,* for the appellee.

SLOAN, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court for Frederick County, vacating, annulling, and setting aside a deed of real estate situate in Frederick County made by Hester C. Zimmerman to her brother, Clayton M. Zimmerman, at the suit of Mamie E. Hull, daughter of the grantor and niece of the grantee.

The appellee, Mamie E. Hull, is the wife of George J. Hull, to whom she was married in the year 1900, and is the only child and heir at law of Hester C. Zimmerman, who died on December 29th, 1926, at the age of seventy years. The appellee was born in 1880 and lived with her mother near Mount Pleasant in Frederick County. Ephraim Zimmerman, father of the appellant and grandfather of the appellee, died intestate in 1894, leaving three farms located in Frederick County, and a dwelling house and lot at Mount Pleasant in that county, and about fifteen thousand dollars of personal assets. He left surviving him his wife, Maria, and two children, a son, Clayton M. Zimmerman, the appellant, born about 1868, and a daughter, Hester C. Zimmerman, born in 1856. By an agreement between the widow and her two children the estate was divided among them equally as to value, each of the children taking a farm and one-third of the personalty, the widow taking a farm and the house and lot at Mount Pleasant and one-third of the personalty. In 1904 the widow conveyed her farm to her son, the appellant, reserving therein an estate for her life, and conveyed the Mount Pleasant property to her daughter, Hester C. Zimmerman, with the reservation of a life estate. In 1879 Hester C. Zimmerman was married to one David Holtz, from whom she was divorced in 1886. The appellee was the only child born of that marriage, and after the divorce resided with her mother until the year 1900, when she was married to George J. Hull, with whom she has since resided. The mother, upon procuring the divorce, resumed her maiden name.

In 1905 the appellant and Hester C. Zimmerman purchased a farm in Frederick County, known in this case as the Cramer farm, for $14,500, the agreement for the purchase of which was made by the appellant, the major portion of the purchase money having been furnished by Hester Zimmerman and her mother, Maria Zimmerman. By deed dated June 7th, 1916, Hester Zimmerman conveyed to the appellant, her brother, the farm which she had taken in the division of her father's estate, the Mount Pleasant property which had been conveyed to her by her mother, and her undivided interest in the Cramer farm, reserving to herself a life estate in all the property conveyed, charging the Mount Pleasant property with an annuity of one hundred and fifty dollars payable to the appellee, so long as she should live, after the death of her mother. It is this deed which the appellee seeks to annul and set aside on the ground that it was the direct result of fraud and undue influence practiced upon Hester C. Zimmerman by her brother, Clayton M. Zimmerman, the appellant, who it is alleged "had such control and influence over the said Hester C. Zimmerman and through devious ways and at various times so poisoned and prejudiced her mind against her own child that the said Hester C. Zimmerman assumed a most unnatural attitude toward her own offspring, and as a result of the control, dominion and influence of the said Clayton M. Zimmerman the said Hester C. Zimmerman made the alleged deed of June 7th, 1916 aforesaid, which your oratrix avers and so charges is null and void and should not be permitted to remain in force and effect, as it violates not only the rights of your oratrix, but the fundamental principles of natural justice." It is alleged as a further evidence of the control and influence of the appellant that on the same day, June 7th, 1916, Hester C. Zimmerman made a last will and testament by which she gave, devised, and bequeathed all her property of every character and description to her brother, the said Clayton M. Zimmerman, without even mentioning the name of the appellee therein.

The testimony of the appellee shows that she lived with her mother until she was twenty years of age, and that she spent

much time at the home of her uncle, the appellant, where she cared for the small children as they came along in that house; that frequently she helped to milk the cows and even worked in the fields; and that her uncle was rough and inhumane in his treatment of her. When she was fourteen years old she was injured by being thrown from a buggy, caused by the horse which she was driving running away, with the result that ever since she has had a double curvature of the spine. She says that Miss Albaugh, whom she was driving, had asked her to drive with her to the mill, that she did not want to go, and that she only went upon her uncle's insistence. His testimony is that he not only was not there, but that he did not know about the accident until the day following, when word was brought to his home. She says that for about a year (her uncle says for nearly three years) she went every month or two to a doctor in Baltimore for treatment. It does appear that every time she was taken to Baltimore to see this doctor it was her uncle who took her, and it is not easy to believe that an uncle who had no feeling for her would have accompanied her and have apparently manifested such concern for her recovery. She testified, as did all of the witnesses, that there existed between her mother and her uncle ties of the strongest affection, and that the uncle generally attended to her mother's business affairs; that her relations with her mother were always cordial and affectionate, but that her uncle was constantly interfering, and that by reason of his interference the requests made by her of her mother were often refused, all of which was denied by the uncle and members of his family. The testimony shows that the brother, together with other members of his family, visited the appellee's mother frequently, usually on Sundays. The mother and the uncle lived several miles apart, and each of them seemed to be attentive to their respective farms.

Without contradiction from any one it appears from the testimony that Hester C. Zimmerman was a most industrious woman, of very decided character, strong in her likes and dislikes. Numerous witnesses for both parties testified that, once she made up her mind to do anything, she could not be

swayed or turned aside. Besides being industrious, she was thrifty and frugal, and what others might regard as ordinary expenditures were to her extravagances. Some of the witnesses said that on the farm she did a man's work. She and her daughter lived together apparently on good terms until the daughter's marriage. It is contended by the appellant's witnesses that she did not approve of the marriage, though it is testified that she not only attended the wedding, which was at a church located on a lot adjoining the place of her own residence, but assisted in the wedding preparations. Several witnesses testified that the mother had said she knew nothing about the wedding until the invitations were issued. The uncle also says he knew nothing of it until that time. The opinion of the court below, to refute the claim that the mother did not approve of the marriage, lays stress upon the fact that she did attend and assist in the preparations for the wedding. Our reading of the record convinces us of one salient fact, and that is that, even if the mother did approve of her daughter's choice at the time of the marriage, she soon grew to dislike the husband, and that, from that time on until the death of Hester C. Zimmerman, the latter had very little to do with him, and the relations between the daughter and her mother lacked the intimacy and cordiality that had existed prior to the marriage.

George J. Hull testified to a quarrel which he had with his mother-in-law on the occasion of a visit to the house at Mount Pleasant about 1903 or 1904, three or four years after his marriage to the appellee, when he resented some bitter remarks made by the mother concerning his wife, the appellee.

In the spring of 1916 the appellee had gone to the Frederick City Hospital for treatment, where she remained three weeks. While there she had her husband ask her mother to come to the hospital to visit her. In answer to the question whether she came, she said, "no, sir. Said she could not leave her mother. That was her excuse. Q. Your mother and your uncle came to your home after you left the hospital, that's right? A. Yes, sir. Q. Did your mother give any reason then for not coming to the hospital? A. Well, I asked

why she didn't come and she said she couldn't leave her mother, and I said, 'Well, you could come up here.' They called my husband three o'clock that morning and said they were coming up, and we were so glad she was coming to see me. So I got up and prepared for them, and my uncle and his son came up and said they hadn't very long to stay. After while my uncle picked up his hat and walked out, and my mother said she had something to say to my husband, and he says, 'What is it?' and she says, 'You said you didn't do your duty.' He said, 'No, I didn't say it that way. I said, Do you think you did your duty not to come to see your daughter?' I walked out and she went out the door and of course I wasn't very well yet. So my husband called my uncle back and he said, 'Uncle Clat, what did you do this for?' and he says, 'You know how she is. I can't do anything with her. You'll have to do the best.' In a week or ten days the transfer came out in the paper."

Of this incident George J. Hull testified as follows: "Q. Do you remember, George, when your wife came back from the hospital, Miss Celia did come up to the place where you were living to see her? A. Yes, sir. Q. Who was with her when she came up? A. His wife, Miss Celia, and Clayton and Clayborne. Q. Didn't you have a controversy with Mrs. Hester Zimmerman on that occasion? A. Not so much of a one. I don't know whether you would call that a controversy or not. Q. Didn't she say she didn't like your conversation with her over the telephone? A. She claimed I insulted her. I said, 'How did I insult you?' She said, 'You told me I didn't do my duty.' I said, 'I didn't.' I said, 'I called you over the phone to go see Mamie at the hospital and as a mother don't you think it is your duty to go see her?' That's what I said and that's the words took place. Q. Didn't she there in the presence of Mrs. Zimmerman and Clayton and Clayborne say she was going to remember you about it, you would never get any of her money? A. No, sir. Q. She didn't? A. No, sir. Q. What did she say then? A. She said, 'I don't want any trouble hereafter.' Q. Didn't she further say that you would never get any of her money? A.

No, sir; threw it up to me I didn't help build the barn; I didn't help raise the barn. Q. (Court) : What year was that, Mr. Hull? A. That was in 1916, one week after Mrs. Hull came home from the hospital; she called me out of bed. Q. What month of the year? A. That was May."

There is no direct evidence in this case of any importunities or suggestions made by the appellant to his sister for the conveyance to him complained of here. The closest connection of any concrete fact with the conveyance itself which might have influenced or caused Hester C. Zimmerman to make the deed to her brother, which excluded her daughter, at the time of its execution, was the incident testified to by her daughter and son-in-law a week or ten days before the deed was made. It is not unreasonable to believe that she then made up her mind to do the thing which she did within ten days thereafter. There is nothing in the record from which we can infer either that her brother was chargeable with the unfortunate controversy, or that he took advantage of the resentment which she manifested then, to himself profit from it. There is a closer connection between this incident and the execution of the deed than there is between the lifelong affection of the brother and sister and the transfer of the property.

It is in evidence that before the deed was made, she told her brother she was going to convey her property to him, and the only thing in the record which shows an expression from him on the subject is that he said he would not accept from her an absolute deed, and would not accept any deed unless she reserved a life estate to herself, as otherwise she, in the event of his dying before her, would be left to the mercy of his children.

On June 7th, 1916, Hester C. Zimmerman went to the office of Mr. Rohrback, a lawyer of high standing at Frederick, whither she was driven by her brother, who left her there, and that there she executed the deed of June 7th, 1916, and at the same time executed a will leaving everything to her brother. Mr. Rohrback testified that by her direction he took the deed to the clerk's office at Frederick and had it recorded, and later it was delivered by him to

the appellant. Mr. Rohrback testified that he had prepared a will for her some years prior to 1916, and on this occasion he prepared a new will for her and destroyed the old one. He said he read the deed over to her and explained it to her; that she well knew what was in the deed because "she gave me directions as to what she wanted done, explained this fully, about the deed and the will which I wrote for her on that occasion." He further testified: "I know there was a feeling between Miss Celia and her daughter, and she told me on that occasion, accentuated it very strongly, that she did not want any of her property except that which she permitted to go into the deed, to go to her daughter, that it could get back to Dave Holtz, her divorced husband. In any way she said she didn't want it to go to Holtz nor did she want it to go to George Hull, and she emphasized that in my office, and had me fix the will accordingly, further stating her reasons for it that Clayton and his children were the nearest to her in the world and that all she had had come to her from her father, and that Clayton had a large family and she didn't want it to go out of the Zimmerman family; she wanted the land particularly to remain in the Zimmerman family. She wanted the papers fixed that way, which I did for her."

The law governing cases of this kind is well settled in numerous decisions in this state. It is not questioned that one of sufficient mental capacity may dispose of his property to whomsoever he will, and that his donations, whether made by will or by deed, will not be set aside because of the belief that he may have been too generous, or have disregarded considerations of kinship which the court may personally feel should have been recognized. Unless the conveyance or testament made by one mentally competent was induced by influence or fraud directly practiced upon the donor, the courts will not disturb the gift or conveyance, no matter to what extent it may violate the standards and requirements of the relationship of those whose expectations may be thus frustrated or fail of realization. *Birchett v. Smith,* 150 Md. 379; *Malone v. Malone,* 148 Md. 200; *Saxton v. Crum,* 107

Md. 393; *Simpson v. League,* 110 Md. 286; *Reil v. Wempe,* 145 Md. 448; *Griffith v. Benzinger,* 144 Md. 575; *Combs v. Scharf,* 143 Md. 7.

In such a case it is not within the province of the courts to write for deceased persons the wills or deeds which they think, in their circumstances, situation, or environment, ought to have been written, or to substitute their will for that of the donors. All that we can do is to apply the settled rules of law to the facts, and determine the validity of the deed or other instrument sought to be overthrown.

In this case there is no attack made, either in the bill or the testimony, on the mental capacity of Hester Zimmerman, the donor, and the only question is whether the deed made to the appellant was the result of undue influence exerted over her by him. That it was unnatural, in that the daughter, an only child, was deprived of her inheritance, must be conceded. This alone, however, is not controlling. If it were, no deed could be made, except for a valuable consideration, to any who were not protected or favored by our laws of descent and distribution.

"Undue influence" is defined in the decisions in this state as "that degree of importunity which deprives the testator of his free agency; which is such as he is too weak or too feeble to resist, and will render the instrument executed under his influence not his free and unrestrained act." *Davis v. Calvert,* 5 G. & J. 269; *Hiss v. Weik,* 78 Md. 446; *Frush v. Green,* 86 Md. 494; *Kelley v. Stanton,* 141 Md. 380; *Longanecker v. Sowers,* 148 Md. 584.

"The influence which the law condemns as undue is that which is operative to such a degree as to amount in effect to coercion. * * * It must not be the influence of affection or attachment, nor the mere desire of gratifying the wishes of another, for that would be a very strong ground in favor of the testamentary act." *White v. Bramble,* 124 Md. 395, 400, 401, and cases there cited.

The record in this case fails to disclose any act or acts from which we can conclude that the deed here complained of was procured by the appellant through the exercise of any

influence exerted by him over his sister, to the end that she might convey all her property to him to the exclusion of her daughter. The only reason given is that the sister was very fond of her brother, and that they had the greatest affection for each other. All his life, before and after the daughter's marriage, he had been very attentive to his sister's needs, and was always doing something to add to her comfort; their relations were friendly and cordial. Whatever either did was right to the other. On the other hand, beginning three or four years after the daughter's marriage, she and her mother drifted apart; they were inclined to be critical of each other. Mrs. Zimmerman did not like her son-in-law, and this added nothing to the happiness of the mother and daughter. There is evidence that the mother had said none of her property would go to the Holtzes or to the son-in-law, Hull, and apparently she decided, soon after her controversy or quarrel with Hull, a few days before the deed was made, to settle things once and for all. She went to Frederick, where she consulted a lawyer of good repute and unquestioned integrity, told him what she wanted to do and then and there did it, when she was of sound mind and in good health. She directed her lawyer to have the deed recorded, and it was by him afterwards delivered to the appellant. It stood on the land records of Frederick County ten years before she died. There was nothing concealed, nothing surreptitious, as in the case of *Horner v. Bell,* 102 Md. 435, or *Frush v. Green,* 86 Md. 494. The whole transaction was as deliberate and as open and above board as Mrs. Zimmerman could make it.

The court below declared that in this case there existed between the appellant and his sister "confidential relations" which put the burden on him to prove affirmatively that the deed was the free, deliberate, and voluntary act of the donor. There are certain relations which place this burden on the one defending the gift as a matter of law, chief among which are parent and child, husband and wife, guardian and ward, trustee and *cestui que trust,* attorney and client, principal and agent. 12 C. J. 421. In *Zimmerman v. Bittner,* 79

Md. 125, quoted in *Upham v. Thomey*, 140 Md. 347, 358, it is said: "But its operation is not confined to the dealings and transactions between parties standing in these relations, but extends to all relations in which confidence is reposed, in which dominion and influence resulting from such confidence may be exercised by one person over another. No part of the jurisdiction of the court is more useful, it has been said, than that which it exercises in watching over and controlling transactions between parties standing in a relation of confidence to each other. And, being founded on the principle of correcting abuses of confidence, it ought to be applied to every case in which the confidential relation exists as a fact—where confidence is reposed on the one side and a resulting superiority and influence on the other." It will therefore be seen from the decisions of this court that, outside of the recognized relationships from which undue influence may be presumed, it is a determination of fact and not of law as to whether a confidential relation does exist. "Whether such close and confidential relations existed between the parties so situated as to enable the one to dominate and control the other would be a question of fact dependent upon the circumstances of each case." *Brown v. Mercantile Trust Co.*, 87 Md. 377, 390; *Callis v. Thomas*, 154 Md. 229; *Mills v. Glenn*, 152 Md. 464; *Wise v. Swartzwelder*, 54 Md. 292.

In the last named case a bill was filed to set aside a deed which had been made by Margaret Wise to her brother, Peter Swartzwelder. In that case this court said: "We think upon the entire case as developed that the burden of proof is on the complainants. No such confidential relations are found to exist between the parties to the deed as to throw that burden upon the defendants, who are the heirs at law of the grantee," and, in the same case, "The question of undue influence rests entirely upon the devotion and affection of Mrs. Wise to her brother, and the belief of the witnesses that she would do anything that he asked her. This of itself is not sufficient ground for declaring that a

deed has been obtained by undue influence." *Eakle v. Reynolds,* 54 Md. 305.

In *Zimmerman v. Bitner,* 89 Md. 115, 126, it was said of the rule of confidential relations: "It ought to be applied to every case in which a confidential relation exists as a fact—where confidence is reposed on the one side, and the resulting superiority and influence on the other." Applying this to the present case, we find that the sister did repose confidence in her brother, the appellant, but on the other side we find no facts from which we can infer that he had any "resulting superiority and influence" over his sister. The evidence shows conclusively that intellectually she was his superior, and without exception the witnesses on both sides testify that she was a strong, forceful character, who had a will of her own.

The appellee in this case strongly relies upon the very vigorous opinion of Judge McSherry in the case of *Frush v. Green,* 86 Md. 494, from which her brief quotes at length. In that case there was a conspiracy between the grantee and others to bodily take charge of the grantor, who was then in an almost dying condition, for the purpose of securing from him a deed to the grantee which was directly in the teeth of his frequently expressed intentions as to the disposition of his property, and for the purpose of excluding the two women who were at that time devoting themselves to comforting him in his last days. The facts are so at variance with those of the instant case as to deprive it of any force as a precedent in this case.

Hester Zimmerman left two posthumous letters, of which the appellant says he knew nothing until after her death, though one of them was in a safe deposit box in the Bank of Frederick which both of them used, and the other in a safe at his home, placed there by his son, which were opened and read after the funeral of his sister. He may or may not have known of them, but the evidence is that they were written after the execution of the deed and they were written by the sister at great length in her own handwriting. They contain nothing except a reiteration and affirmance

of her displeasure with her daughter and her dislike of her former husband and of her son-in-law. The deed had already been made and placed on record and the thing was done. From that time until the day she died there is no evidence of any expression from her to indicate that she regretted having made this disposition of her property, or that she wished to undo anything that she had done.

In our opinion the deed here sought to be set aside appears from the evidence to have been the free and voluntary act of Hester Zimmerman, executed when she was of sound mind, with control of the property reserved during her lifetime, with no evidence that she was prevailed upon by her brother to make the deed to him. Her affection for her brother, which every one affirmed and no one sought to deny, may have controlled her, but that, as has been indicated, is not undue influence. In the absence, as we find, of mental incapacity or undue influence, Mrs. Zimmerman, exercised the right, which the law recognizes, to dispose of her own as she would.

*Decree reversed, with costs.*

———

ADKINS, J., filed the following dissenting opinion:

I regret to differ from the views of the majority. But I find enough in the record to raise in my mind at least a grave doubt of the good faith, if not to create a settled conviction of the bad faith, of the appellant; which doubt appellant failed to remove.

In this state of mind I regard it as safer to accept the conclusion on facts reached by the able and careful judges who had the witnesses before them than to indulge my own speculations.

Neither have I any question that the trial court correctly found, on the facts, that this case should be decided on the principle of confidential relations.